**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ABRAHAM MONGER, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:17-CV-00205 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | JANUARY 31, 2019 |
| TRANSPORTATION and | : | |
| JAYANTHA MATHER, | : | |
| Defendants. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (DOC. NO. 75)**

**I.      INTRODUCTION**

The plaintiff, Abraham Monger ("Monger"), brings three claims of employment

discrimination against the Connecticut Department of Transportation ("DOT") and

Jayantha Mather ("Mather") in his individual capacity (collectively, "the defendants").

See generally Second Amended Complaint ("Second Am. Compl.") (Doc. No. 43).

Count One of the Second Amended Complaint alleges that the DOT denied Monger

promotional opportunities on the basis of his race in violation of Title VII of the Civil

Rights Act, 42 U.S.C. § 2000e, et. seq., which prohibits disparate treatment,

harassment, and the creation of a hostile work environment.  See id. at 1–6.  Count Two

alleges that Mather, who led the DOT division in which Monger worked, violated

Monger's rights under the Equal Protection Clause of the Fourteenth Amendment.  See

id. at 6–9.  Count Three alleges that the DOT further violated Title VII by retaliating

against Monger for filing an employment discrimination complaint with the Connecticut

Commission on Human Rights and Opportunities ("CHRO").  See id. at 10–11.  The

defendants now move for summary judgment as to all three Counts.  Defendants'

Motion for Summary Judgment ("Mot.") (Doc. No. 75) at 1.

For the reasons set forth below, the defendants' Motion for Summary Judgment is granted.

## II.    BACKGROUND

On June 20, 2008, the DOT hired Monger, an African American man, as an Engineer Intern.  Defendants' Local Rule 56(a)1 Statement of Facts ("Defs.' L.R. 56(a)1") (Doc. No. 75-2) at ¶ 1; Plaintiff's Local Rule 56(a)2 Statement of Facts ("Pl.'s L.R. 56(a)2") (Doc. No. 88-1) at 1, ¶ 1, 14 ¶ 30.  Initially, Monger worked in the Bridge Safety Unit of the DOT's Bureau of Engineering and Construction.  Defs.' L.R. 56(a)1 at ¶ 5; Pl.'s L.R. 56(a)2 at 1, ¶ 5.  In March of 2011, however, Monger transferred to the Bureau of Public Transportation's Office of Rails.  Defs.' L.R. 56(a)1 at ¶ 8; Pl.'s L.R. 56(a)2 at 1, ¶ 8.  Monger transferred because, inter alia, (1) his relationship with one of his supervisors at the Bureau of Engineering and Construction had deteriorated; (2) he felt that he was not being given support in performing his job; and (3) he believed that his education and expertise were better suited for the Office of Rails.  Defs.' L.R. 56(a)1 at ¶ 7; Pl.'s L.R. 56(a)2 at 1, ¶ 7.

When Monger first arrived at the Office of Rails, he reported to Haresh Dholakia ("Dholakia"), a Transportation Engineer 3 ("TE3").  Defs.' L.R. 56(a)1 at ¶ 8; Pl.'s L.R. 56(a)2 at 1, ¶ 8.  Dholakia, in turn, reported to Lev Laber ("Laber"), a Transportation Supervising Engineer ("TSE").  Id.  Laber, in turn, reported to Mather, who led the Office of Rails as its Principal Engineer.  Id.  Mather was promoted from Supervising Engineer to Principal Engineer in 2000.  Defs.' L.R. 56(a)1 at ¶ 4; Pl.'s L.R. 56(a)2 at 1, ¶ 4.

On July 15, 2011, Monger was promoted from Engineer Intern to Transportation Engineer 2 ("TE2").   Defs.' L.R. 56(a)1 at ¶ 10; Pl.'s L.R. 56(a)2 at 1, ¶ 10.  That promotion became permanent after Monger satisfactorily completed a six month

probationary period as a TE2 engineer. Defs.' L.R. 56(a)1 at ¶ 10; Pl.'s L.R. 56(a)2 at 1, ¶ 10. In his evaluation of Monger's job performance during this probationary period, Haresh Dholakia ("Dholakia"), who was Monger's immediate supervisor at the time, rated Monger's job performance as "good" on a scale ranging from "unsatisfactory" to "excellent." Defs.' L.R. 56(a)1 at ¶¶ 8, 12; Pl.'s L.R. 56(a)2 at 1, ¶¶ 8, 12; Monger Deposition Exhibits (Doc. No. 75-5) at 4–5 (Dholakia's performance review).

In 2012, Dholakia received a promotion within the Office of Rails, and Rosemary Rodriquez ("Rodriquez") became Monger's immediate supervisor. Defs.' L.R. 56(a)1 at ¶¶ 11, 13; Pl.'s L.R. 56(a)2 at 1, ¶¶ 11, 13. Rodriquez had previously supervised Monger when they both worked at the Bureau of Engineering and Construction. Defs.' L.R. 56(a)1 at ¶ 13; Pl.'s L.R. 56(a)2 at 1, ¶ 13. In her evaluation of Monger's job performance for September 13, 2012, through August 30, 2013, Rodriquez gave Monger an overall rating of "satisfactory," which is less positive than his previous rating of "good." Defs.' L.R. 56(a)1 at ¶ 16; Pl.'s L.R. 56(a)2 at 2, ¶ 16; Monger Deposition Exhibits at 87-88. Rodriquez's evaluation also identified several areas in which Monger could improve his performance. Defs.' L.R. 56(a)1 at ¶ 17; Pl.'s L.R. 56(a)2 at 2, ¶ 17.

In late 2013, Monger asked Mather, who headed up the Office of Rails as its Principal Engineer, to reassign him to worker under Daniel Young ("Young"). Defs.' L.R. 56(a)1 at ¶¶ 19, 21, 22; Pl.'s L.R. 56(a)2 at 2, ¶¶ 19, 21, 22. Monger expressed concern to Mather about progressing his career under Rodriquez's supervision. Defs.' L.R. 56(a)1 at ¶ 22; Pl.'s L.R. 56(a)2 at 2, ¶ 22. According to Mather's undisputed testimony, Mather assigned Monger to work under Young's supervision "because [Monger] wanted to go there." Defs.' L.R. 56(a)1 at ¶ 22; Pl.'s L.R. 56(a)2 at 1, ¶ 22.

On September 15, 2014, Young issued his evaluation of Monger's job performance for the prior year, giving Monger an overall rating of "satisfactory." Defs.' L.R. 56(a)1 at ¶ 32; Pl.'s L.R. 56(a)2 at 3, ¶ 32. On March 20, 2015, Young issued Monger a written warning for insubordination on the grounds that Monger failed to follow Mather's order to not move furniture within his assigned area. Defs.' L.R. 56(a)1 at ¶ 34; Pl.'s L.R. 56(a)2 at 3, ¶ 34. The warning was later rescinded and reduced to a written counseling. Id. Approximately six months after this incident, Young issued a review of Monger's job performance for the period of September 2014 to September 2015. Defs.' L.R. 56(a)1 at ¶ 37; Pl.'s L.R. 56(a)2 at 3, ¶ 37. Young, again, rated Monger's overall performance as "satisfactory." Id.

During his time at the Office of Rails, Monger applied for several promotions from his TE2 position to a Transportation Engineer 3 ("TE3") position. See, e.g., Defs.' L.R. 56(a)1 at ¶ 54; Pl.'s L.R. 56(a)2 at 4, ¶ 54. In particular, his instant lawsuit for employment discrimination is based on several TE3 promotional opportunities that were given to Monger's co-workers. See Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n") (Doc. No. 88) at 6 (listing the TE3 vacancies at issue in this case).

A.    Reclassifications

According to the undisputed written testimony of Vicki Arpin, DOT's Human Resources Administrator, DOT employees can be promoted through either (1) the formal job posting and selection process, or (2) a reclassification of the position of an incumbent employee. See Arpin Exhibits (Doc. No. 75-9) at 2, ¶ 8. Ordinarily, for an employee to be promoted by reclassification, DOT management must submit a formal reclassification request on behalf of the employee, and the reclassification must be

approved by the Human Resources Administrator, the Division Head or Bureau Chief, the DOT Chief Fiscal Administrative Officer, and the Department of Administrative Services and Office of Policy Management. Id. However, employees can also obtain reclassification through a reclassification appeals process that is administered by the Department of Administrative Services. See id. at 3, ¶ 10. This appeals process may result in reclassification to a higher position if the Department of Administrative Services finds that the employee is, in fact, performing the duties required by that higher position. See id.

Monger's lawsuit identifies three DOT employees who were promoted from TE2 positions to TE3 positions through reclassification. See Pl.'s Opp'n at 6. First, in 2011, Eric Lloyd ("Lloyd") filed a formal reclassification appeal with the Department of Administrative Services, seeking to be promoted from a TE2 position to a TE3 position based on the claim that he was performing TE3 job duties. Defs.' L.R. 56(a)1 at ¶ 29; Pl.'s L.R. 56(a)2 at 2, ¶ 29. The Department of Administrative Services conducted an audit of Lloyd's duties and determined that he was performing the duties of the TE3 position. Id. On January 12, 2012, Lloyd entered into a stipulated agreement with his union, the DOT, and the Department of Administrative Services that temporarily reclassified Lloyd to a TE3 position. Id. Pursuant to this agreement, Lloyd could apply to make his reclassification permanent if he passed the Department of Administrative Services' merit system examination for TE3 positions ("the TE3 examination"). Id. This condition reflected DOT's general requirement that, before an employee could become a TE3 engineer, that employee must pass the TE3 examination. See Arpin Exhibits at

9, ¶ 33; Pl.'s Opp'n at 4.  Monger did not pass the TE3 examination until June 27, 2014. Defs.' L.R. 56(a)1 at ¶ 31; Pl.'s L.R. 56(a)2 at 3, ¶ 31.[1]

Second, the Rail Administrator for the Bureau of Public Transportation formally requested on February 7, 2014, that Gustavo Melo ("Melo") be reclassified from a TE2 engineer to a TE3 engineer.  Defs.' L.R. 56(a)1 at ¶ 26; Pl.'s L.R. 56(a)2 at 2, ¶ 26.  The request, which was subsequently approved, justified the reclassification on the grounds that (1) the Office of Rails needed to fill a TE3 vacancy in order to comply with federal regulations regarding bridge inspection; and (2) Melo was qualified because he possessed a degree in Civil Engineering, had passed the requisite TE3 examination, and was performing the duties of a TE3 bridge inspector.  Arpin Affidavit at 3, ¶ 11;

Finally, on March 19, 2014, the DOT reclassified Ashish Patel ("Patel") to a TE3 position that involved overseeing certain electrification projects.  Defs.' L.R. 56(a)1 at ¶ 28; Pl.'s L.R. 56(a)2 at 2, ¶ 28.  According to Arpin's undisputed written testimony, Patel, who had an Electrical Engineering Degree and had passed the TE3 examination in December 2013, had been performing the duties of a TE3 engineer.  Arpin Affidavit at 4, ¶ 12; id at 12 (dated letter informing Patel that he had passed the TE3 examination).

B.    Office of Rails

Monger applied for two TE3 vacancies in the Office of Rails that the DOT posted in January 2016.  Defs.' L.R. 56(a)1 at ¶ 73; Pl.'s L.R. 56(a)2 at 5, ¶ 73.  The initial posting for these positions indicated that these jobs required a degree in either Civil

---

[1] In February 2017, Monger learned that the examinations for TE1, TE2, and TE3 positions were being eliminated.  Pl.'s L.R. 56(a)2 at 22, ¶ 84.  However, as all of the TE3 promotions at issue in this case occurred prior to 2017, see Pl.'s Opp'n at 6, there is no dispute that the TE3 examination requirement applied at all times relevant to this lawsuit, see Pl.'s Opp'n at 4 ("Before an employee can become a TE3, that employee must pass the Connecticut Department of Administrative Services ('DAS') examination").

Engineering or Structural Engineering.  Defs.' L.R. 56(a)1 at ¶ 78; Pl.'s L.R. 56(a)2 at 5,

¶ 78; Pl.'s Ex. 15 (Doc. No. 88-5) at 43 (initial job posting).  However, a February re-

posting of these vacancies modified the educational criteria, indicating that a Civil or

Structural Engineering degree was "preferred," as opposed to "required."  Defs.' L.R.

56(a)1 at ¶ 80; Pl.'s L.R. 56(a)2 at 5, ¶ 80; Pl.'s Ex. 16 (Doc. No. 88-5) at 45 (job re-

posting).  Both versions of the posting called for applicants with, inter alia,

"[c]onsiderable knowledge of [the] principles and practices involved in transportation

engineering such as bridge design, foundations, highway design, transportation facilities

design, transportation planning, drainage or hydraulics, research, pavement design,

pavement management and traffic[.]"  Pl.'s Exs. 15 & 16.

On March 9, 2016, Mather submitted an "Interview Selection Report" to the DOT

Human Resources in connection with these two TE3 vacancies in the Office of Rails.

Defs.' L.R. 56(a)1 at ¶ 84; Pl.'s L.R. 56(a)2 at 5, ¶ 84.  The Interview Selection Report

summarized the name of each job applicant; their race and gender; the interview date;

and the three-member selection committee's explanation for why a particular candidate

was recommended or not recommended for the position.  Defs.' L.R. 56(a)1 at ¶ 84;

Pl.'s L.R. 56(a)2 at 5, ¶ 84; Arpin Exhibits at 5, ¶ 19; id. at 30 (Interview Selection

Report).

Of the 24 candidates who applied for the two TE3 positions, 17 were not

interviewed, including Monger.  Defs.' L.R. 56(a)1 at ¶ 88; Pl.'s L.R. 56(a)2 at 6, ¶ 88.

The Interview Selection Report indicated that Monger was denied an interview because

he did not have a degree in Civil or Structural Engineering.  Defs.' L.R. 56(a)1 at ¶ 89;

Pl.'s L.R. 56(a)2 at 6, ¶ 89.  Monger had a Bachelor of Science Degree in Civil

Engineering Technology at that time, although he later obtained a Master's Degree in Civil Engineering in September 2016. Defs.' L.R. 56(a)1 at ¶¶ 2, 3, 90; Pl.'s L.R. 56(a)2 at 1, ¶¶ 2, 3; id. at 6, ¶ 90. Eight other applicants were also not interviewed because they did not possess a degree in Civil or Structural Engineering, including three who, like Monger, held degrees in Civil Engineering Technology. Defs.' L.R. 56(a)1 at ¶¶ 89, 90; Pl.'s L.R. 56(a)2 at 6, ¶¶ 89, 90. The Interview Selection Report further indicated that all of the candidates who were interviewed for these vacancies possessed a degree in Civil or Structural Engineering, including the two applicants who were ultimately selected for the position: Brett McKiernan ("McKiernan") and Jason Vincent ("Vincent"). Defs.' L.R. 56(a)1 at ¶¶ 83, 86, 87; Pl.'s L.R. 56(a)2 at 6, ¶¶ 83, 86, 87.

C.    Division of Bridges

On October 30, 2015, the Bureau of Engineering and Construction posted several TE3 vacancies in its Division of Bridges. Defs.' L.R. 56(a)1 at ¶ 54; Pl.'s L.R. 56(a)2 at 4, ¶ 54. The job description outlined an array of responsibilities relating to bridge design and inspection, including, inter alia, managing consultants, overseeing bridge repair and replacement projects, responding to bridge emergencies, and acting as a liaison between towns and the state. See Bhardwaj Exhibits (Doc. No. 75-12) at 8 (job posting). The posting called for candidates with, inter alia, knowledge of highway and bridge construction materials and methods; the ability to analyze bridge and structural design problems; and the ability to work cooperatively with other Department units, consultants, towns, and state and federal agencies. Id.

The interview selection panel tasked with filling these vacancies consisted solely of members of the Bureau of Engineering and Construction. Defs.' L.R. 56(a)1 at ¶ 54; Pl.'s L.R. 56(a)2 at 4, ¶ 54. Accordingly, Mather, who was employed in the Office of

Rails, had no role in selecting applicants to fill these vacancies. Defs.' L.R. 56(a)1 at ¶ 64; Pl.'s L.R. 56(a)2 at 4, ¶ 64.

According to the Interview Selection Report produced in connection with these TE3 job openings, Monger was among the ten applicants who applied for the positions. Bhardwaj Exhibits at 9–12 (Interview Selection Report). Although Monger was interviewed for the vacancies on December 11, 2015, he was not offered a position. Defs.' L.R. 56(a)1 at ¶ 54; Pl.'s L.R. 56(a)2 at 4, ¶ 54. Instead, the interview selection panel selected the following five applicants: Gustavo Melo ("Melo"), Rosemary Rodriquez ("Rodriquez"), Ryan Martin ("Martin"), Gregory Funk ("Funk"), and Michael Waite ("Waite"). Defs.' L.R. 56(a)1 at ¶ 56; Pl.'s L.R. 56(a)2 at 4, ¶ 56.

Melo and Rodriquez were already TE3 engineers in the Office of Rails when they applied for the TE3 vacancies in the Division of Bridges. Defs.' L.R. 56(a)1 at ¶ 54; Pl.'s L.R. 56(a)2 at 4, ¶ 54. Martin and Funk, on the other hand, were both TE2 engineers seeking to be promoted to TE3 engineers. Defs.' L.R. 56(a)1 at ¶ 56; Pl.'s L.R. 56(a)2 at 4, ¶ 56. Finally, Waite was a new hire who had previously worked at a consultant engineering company. Defs.' L.R. 56(a)1 at ¶ 61; Pl.'s L.R. 56(a)2 at 4, ¶ 61.

As documented in its Interview Selection Report, the selection committee determined that Monger was less experienced and less qualified than the successful applicants. Defs.' L.R. 56(a)1 at ¶ 62; Pl.'s L.R. 56(a)2 at 4, ¶ 62; Bhardwaj Exhibits at 9–11 (Interview Selection Report). In particular, the panel noted that Monger had received "satisfactory" ratings on his job performance reviews. Defs.' L.R. 56(a)1 at ¶ 62; Pl.'s L.R. 56(a)2 at 4, ¶ 62. It further noted:

[Monger] provided very brief answers to all the questions and although [he] hit a couple of key points on some of them, he did not provide detailed or comprehensive responses to any of the questions.

Bhardwaj Exhibits at 11; <u>see also</u> Defs.' L.R. 56(a)1 at ¶ 62; Pl.'s L.R. 56(a)2 at 4, ¶ 62.

As for the five successful applicants, the Interview Selection Report noted that all but one of them received "excellent" ratings on their job performance reviews. Bhardwaj Exhibits at 9–10; Defs.' L.R. 56(a)1 at ¶ 62; Pl.'s L.R. 56(a)2 at 4, ¶ 62. The exception was Waite, a new hire who had 15 years of experience working for a consulting firm on bridge inspection. Bhardwaj Exhibits at 10; Defs.' L.R. 56(a)1 at ¶ 61; Pl.'s L.R. 56(a)2 at 4, ¶ 61.

For each successful candidate, the Interview Selection Report also documented the specific knowledge or experience that, in the panel's opinion, made the candidate qualified for the position. Bhardwaj Exhibits at 9–10. For Melo, the selection committee highlighted, <u>inter alia</u>, his extensive experience in managing consultants, and his responses to interview questions, which responses "demonstrated a clear understanding of all phases of bridge engineering, including both design and inspection." <u>Id.</u> at 9; <u>see also</u> Defs.' L.R. 56(a)1 at ¶ 57; Pl.'s L.R. 56(a)2 at 4, ¶ 57. With respect to Rodriquez, the panel noted, <u>inter alia</u>, her "extensive background in DOT materials testing," her "extensive experience in designing bridges and managing consultants," and her problem solving abilities, as demonstrated by her "handling of a difficult emergency declaration project[.]" Bhardwaj Exhibits at 9; <u>see also</u> Defs.' L.R. 56(a)1 at ¶ 57; Pl.'s L.R. 56(a)2 at 4, ¶ 57. In the case of Martin, the panel cited examples of Martin's interview responses that demonstrated his "thorough understanding of both the design and inspection of bridges," including, <u>inter alia</u>, "his

responses to the question for the NBI bridge ratings/element level inspection."
Bhardwaj Exhibits at 10; <u>see also</u> Defs.' L.R. 56(a)1 at ¶ 59; Pl.'s L.R. 56(a)2 at 4, ¶ 59.
The panel also noted that Martin had recently acquired a Principal Engineer License;
that he had won the DOT Teamwork award; and that his previous experience working
as a consultant made him a "valuable candidate."  Bhardwaj Exhibits at 10; <u>see also</u>
Defs.' L.R. 56(a)1 at ¶ 59; Pl.'s L.R. 56(a)2 at 4, ¶ 59.  With respect to Funk, the panel
noted, <u>inter alia</u>, that he had extensive knowledge of "the purpose and types of bridge
joints and bridge procedures"; that he "was instrumental in writing [ ] the new Load
Rating Manual"; that he had "good field experience in inspecting bridges due to his
previous experience working for a consultant"; and that he had demonstrated his
leadership and management skills by training co-workers in a new software used for
load rating bridges.  Bhardwaj Exhibits at 10; <u>see also</u> Defs.' L.R. 56(a)1 at ¶ 60; Pl.'s
L.R. 56(a)2 at 4, ¶ 60.  Finally, regarding Waite, the panel noted, <u>inter alia</u>, that he had
demonstrated extensive knowledge and experience with DOT bridge inspection
procedures, including 15 years of experience as a bridge inspection team leader
working for a consultant engineering company.  Bhardwaj Exhibits at 10; <u>see also</u> Defs.'
L.R. 56(a)1 at ¶ 61; Pl.'s L.R. 56(a)2 at 4, ¶ 61.  The panel also highlighted Waite's
knowledge of "the types of bridge joints, performance shortfalls, [and] the 'NBM'
Component Rating System."  Bhardwaj Exhibits at 10; <u>see also</u> Defs.' L.R. 56(a)1 at ¶
61; Pl.'s L.R. 56(a)2 at 4, ¶ 61.

      D.    <u>Division of Hydraulics and Drainage</u>

     On November 13, 2015, the Bureau of Engineering and Construction posted a
TE3 position in its Division of Hydraulics and Drainage.  Defs.' L.R. 56(a)1 at ¶ 68; Pl.'s
L.R. 56(a)2 at 5, ¶ 68.  The position "required, among other things, 'considerable

knowledge' of hydrologic and hydraulic engineering related to storm drainage systems, culverts, highway or railroad bridges over waterways, dams and related facilities." Defs.' L.R. 56(a)1 at ¶ 68; Pl.'s L.R. 56(a)2 at 5, ¶ 68; Masayda Exhibits (Doc. No. 75-15) at 7 (job posting). Mather was not involved in the selection process for this TE3 position. Defs.' L.R. 56(a)1 at ¶ 72; Pl.'s L.R. 56(a)2 at 5, ¶ 72.

As summarized in the Interview Selection Report produced in connection with this TE3 vacancy, there were five applicants, including Monger. Defs.' L.R. 56(a)1 at ¶ 70; Pl.'s L.R. 56(a)2 at 5, ¶ 70; Masayda Exhibits at 9 (Interview Selection Report). Two of the applicants, Eric Buckley ("Buckley") and Michael Mastroluca ("Mastroluca"), were given offers, which they ultimately declined to accept. Defs.' L.R. 56(a)1 at ¶ 70; Pl.'s L.R. 56(a)2 at 5, ¶ 70. The selection committee noted that both of those applicants "[d]emonstrated a thorough knowledge of hydrology, hydraulics, storm drainage design, environmental permitting and software applications." Masayda Exhibits at 9; Defs.' L.R. 56(a)1 at ¶ 70; Pl.'s L.R. 56(a)2 at 5, ¶ 70. With respect to the three applicants who were not offered the position, including Monger, the Interview Selection Report noted that they lacked "minimal experience in Hydraulics and Drainage." Masayda at 9; Defs.' L.R. 56(a)1 at ¶ 71; Pl.'s L.R. 56(a)2 at 5, ¶ 71.

E.    Division of Facilities and Transit

On November 4, 2016, the Bureau of Engineering and Construction posted two TE3 vacancies in its Facilities and Transit Division. Defs.' L.R. 56(a)1 at ¶ 111; Pl.'s L.R. 56(a)2 at 7, ¶ 111. The job posting described a variety of responsibilities, including, inter alia, "acting as project engineer with lead responsibility for developing engineering plans, specifications, and estimates for facility projects, including moveable

bridges designed with in-house staff." Hanifin Exhibits (Doc. No. 75-13) at 7 (job posting).

Nine applicants, including Monger, applied for the two positions. Defs.' L.R. 56(a)1 at ¶¶ 112, 115; Pl.'s L.R. 56(a)2 at 7, ¶¶ 112, 115. Mather was not involved in interviewing or selecting applicants for these openings. Defs.' L.R. 56(a)1 at ¶ 114; Pl.'s L.R. 56(a)2 at 7, ¶ 114. The vacancies were ultimately filled by David Gruttadauria ("Gruttadauria") and Jeffrey Portal ("Portal"). Defs.' L.R. 56(a)1 at ¶ 116; Pl.'s L.R. 56(a)2 at 7, ¶ 116.

In the Interview Selection Report that was submitted in connection with these two job postings, the interview selection committee determined that Gruttadauria was the most qualified candidate, noting, in particular, that he held a Professional Engineer License, that he had previous experience on multiple types of bridge design projects, that he was DOT's "subject matter expert for Microsoft projects," and that he answered all of his interview questions with specific details. Defs.' L.R. 56(a)1 at ¶ 117; Pl.'s L.R. 56(a)2 at 7, ¶ 117. Hanifin Exhibits at 9 (Interview Selection Report). Regarding Portal, the committee highlighted his "experience on a very complex movable bridge design project [involving] numerous consultants and outside agencies"; his experience "as the project lead for meetings"; and his detailed responses to all of his interview questions. Defs.' L.R. 56(a)1 at ¶ 118; Pl.'s L.R. 56(a)2 at 7, ¶ 118.

With respect to Monger, the interview selection panel noted that Monger's "response[s] to question[s] regarding design and administration of projects [were] not as thorough as [the] recommended candidates," and that "[Monger] did not demonstrate

experience on a complex project."  Hanifin Exhibits at 9; see also Defs.' L.R. 56(a)1 at ¶ 120; Pl.'s L.R. 56(a)2 at 7, ¶ 120.

F.    Division of Bridges, State Bridge Design, and Bridge Consultant Design

On October 26, 2016, the Bureau of Engineering and Construction posted several TE3 job openings in its Division of Bridges, State Bridge Design, and Bridge Consultant Design.  Defs.' L.R. 56(a)1 at ¶ 99; Pl.'s L.R. 56(a)2 at 6, ¶ 99.  The position's responsibilities included, inter alia, managing DOT's bridge list structure rehabilitation program, performing complex structural design work, and overseeing design crew engineering work and field inspection of structural conditions of existing structures and project sites.  Cutler Exhibits (Doc. No. 75-14) at 6 (job posting).

Jacob Booth ("Booth") was offered the position from among the seven applicants, including Monger.  Defs.' L.R. 56(a)1 at ¶ 106; Pl.'s L.R. 56(a)2 at 7, ¶ 106.  Mather again had no role or involvement in interviewing or selecting applicants to fill this vacancy.  Defs.' L.R. 56(a)1 at ¶ 101; Pl.'s L.R. 56(a)2 at 6, ¶ 101.

In the Interview Selection Report that it submitted in connection with this position, the interview selection panel noted that Booth had received two "excellent" ratings in his job performance reviews, as compared to Monger's "satisfactory" ratings.  Cutler Exhibits at 8, 9 (Interview Selection Report); Defs.' L.R. 56(a)1 at ¶ 107; Pl.'s L.R. 56(a)2 at 7, ¶ 107.   The Interview Selection Report also documented that Booth scored better than Monger on questions posed by the panel during the interview.  See Cutler Exhibits at 8, 9.  For example, while Booth described four of "the eight expected responses for what to look for when performing a review of plans, specs and estimates," Monger "did not identify any of the eight expected responses."  Id.; see also Defs.' L.R. 56(a)1 at ¶¶ 107, 108; Pl.'s L.R. 56(a)2 at 7, ¶¶ 107, 108.  Similarly, while Booth

described six of nine expected responses for "factors that influence selection of a specific structure type," Monger described only four of the nine expected responses. Cutler Exhibits at 8, 9; Defs.' L.R. 56(a)1 at ¶¶ 107, 108; Pl.'s L.R. 56(a)2 at 7, ¶¶ 107, 108.

## III. PROCEDURAL HISTORY

On March 29, 2016, Monger filed an internal affirmative action complaint with the DOT, alleging that Mather had discriminated against him on the basis of race by (1) not interviewing him for two TE3 openings in the Office of Rails, (2) giving him a poor evaluation, and (3) subjecting him to a hostile work environment. Defs.' L.R. 56(a)1 at ¶ 95; Pl.'s L.R. 56(a)2 at 6, ¶ 95. On June 30, 2016, the DOT Affirmative Action Office issued a report concluding that Monger's internal complaint could not be substantiated. Defs.' L.R. 56(a)1 at ¶ 96; Pl.'s L.R. 56(a)2 at 6, ¶ 96. Monger filed a second internal complaint with the DOT Affirmative Action Office on March 10, 2017, alleging that he has been denied promotional opportunities on the basis of race and in retaliation for his earlier complaints of discrimination. Pl.'s L.R. 56(a)2 at 11, ¶ 17.

On May 25, 2016, Monger filed a complaint of race-based discrimination with the Connecticut Commission on Human Rights and Opportunities ("the CHRO"). Pl.'s Opp'n at 20; Defendants' Memorandum in Support of Motion for Summary Judgment ("Defs.' Mem.") (Doc. No. 75-1) at 33. Monger received a release of jurisdiction letter from the CHRO on November 14, 2016. Pl.'s Ex. A (Doc. No. 26-2) at 1. He then initiated the current action on February 13, 2017. Complaint (Doc. No. 1).

On April 19, 2017, the DOT filed a Motion to Dismiss all counts, which this court granted in part and denied in part. Motion to Dismiss ("Mot. to Dismiss") (Doc. No. 24); Ruling Re: Motion to Dismiss (Doc. No. 31) at 13. Given leave to replead, Monger filed

15

a Second Amended Complaint on November 1, 2017. See generally Second Am.

Compl. On April 30, 2018, the defendants filed their Motion for Summary Judgment,

which is now pending before this court. See generally Mot.

## IV.  STANDARD OF REVIEW

On a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that the party is

entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71–72 (2d Cir. 2016).

Once the moving party has met its burden, the nonmoving party "must set forth specific

facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and

present "such proof as would allow a reasonable juror to return a verdict in [its] favor,"

Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "An issue of fact is

genuine and material if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d

155, 162 (2d Cir. 2016).

In assessing the record to determine whether there are disputed issues of

material fact, the trial court must "resolve all ambiguities and draw all inferences in favor

of the party against whom summary judgment is sought." LaFond v. Gen. Physics

Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995). "Where it is clear that no rational finder

of fact 'could find in favor of the nonmoving party because the evidence to support its

case is so slight,' summary judgment should be granted." F.D.I.C. v. Great Am. Ins.

Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs.,

Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)). On the other hand, where "reasonable

minds could differ as to the import of the evidence," the question must be left to the

finder of fact.  Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 230 (2d Cir. 2015)

(quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)).

## V.    DISCUSSION

The defendants move for summary judgment on all of Monger's claims.  Mot. at

1.  With respect to Monger's Title VII claims of disparate treatment and retaliation, the

defendants argue that these claims fail as a matter of law because (1) Monger has not

established a prima facie case of discrimination, and (2) he has not come forward with

evidence showing that the DOT's reasons for not promoting Monger were pretext for

discrimination.  Defs.' Mem. at 13, 34.  They argue that summary judgment is also

warranted as to Monger's Equal Protection claim because, inter alia, there is no

evidence in the record suggesting that any of Mather's actions were motivated by

discriminatory animus.  Id. at 31.  The court will address each of these arguments in

turn.

### A.    Title VII Disparate Treatment

Title VII claims for discriminatory failure to promote are governed by the burden-

shifting framework set forth by the Supreme Court in McDonnell Douglas v. Green, 411

U.S. 792 (1973).  See Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000).

Under this framework, "[a] plaintiff must establish a prima facie case; the employer must

offer through the introduction of admissible evidence a legitimate non-discriminatory

reason for the discharge; and the plaintiff must then produce evidence and carry the

burden of persuasion that the proffered reason is a pretext."  McBride v. BIC Consumer

Prod. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (internal quotation marks omitted).

1.    Prima Facie Case

In order to make out a prima facie case of discriminatory failure to promote, "a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the job for which she applied, (3) she was denied the job, and (4) the denial occurred under circumstances giving rise to an inference of discrimination on a basis forbidden by Title VII." Howley, 217 F.3d at 150. The Second Circuit has described the plaintiff's burden to establish a prima facie case of discrimination at the summary judgment stage as "not onerous" and "de minimis." Id. (internal quotation marks omitted).

The defendants acknowledge that Monger is a member of a protected class because he is African American. Defs.' Mem. at 14. However, they argue that Monger has not carried his burden with respect to the second and fourth elements of the prima facie case. Id. The court will briefly address these arguments below.

a.    Qualifications

The defendants argue that Monger was not qualified for the following positions: (1) the TE3 positions that Lloyd, Melo, and Patel secured by way of reclassification, id. at 12–13; (2) the TE3 positions in the Office of Rails, id. at 15–16; and (3) the TE3 positions in the Division of Hydraulics and Drainage, id. at 17–18.

In the context of the McDonnell Douglas prima facie case, "being 'qualified' refers to the criteria the employer has specified for the position." Thornley v. Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997). The Second Circuit has directed district courts to afford broad deference to the employer's choice of hiring criteria for a position: "Absent a showing by the plaintiff that the employer's demands were made in bad faith, an employer who is sued on allegations of [ ] discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury." Id.

(internal citations omitted).  Bad faith may be shown with evidence that an employer does not uniformly apply its hiring criteria, such as when employers "relax[ ]" job requirements only for employees who are not members of the plaintiff's protected class. Howley, 217 F.3d at 151, 152.

In this case, there is no issue of fact as to whether Monger was qualified for the TE3 positions that Lloyd, Melo, and Patel obtained through reclassification.  It is undisputed that, at the time of these reclassifications, the only employees who were eligible for TE3 positions were those who had passed the TE3 examination.  See, supra, at 5.  It is further undisputed that Monger did not pass the TE3 examination until June 27, 2014, well after the reclassifications of Lloyd, Melo, and Patel.  See, supra, at 5–6.  As a result, no reasonable jury could conclude that Monger was qualified for these three TE3 positions.

Moreover, there is no evidence in the record to suggest that the DOT developed the TE3 examination requirement in bad faith or that it selectively applied this requirement to discriminate against a particular class of employees.  Monger does not dispute that Melo and Patel both passed the TE3 examination before they were promoted to their TE3 positions.  See, supra, at 6.  Nor does Monger suggest that Lloyd's reclassification, which occurred prior to Lloyd passing the TE3 examination, is evidence of bad faith.  See Pl.'s Opp'n at 13 (acknowledging that, "[a]dmittedly, Lloyd was granted TE3 status by function of a union grievance").  Indeed, Lloyd appears to be the exception that proves the rule, as the settlement agreement that resulted in Lloyd's reclassification stipulated that his promotion to the TE3 position would only become permanent if Lloyd passed the TE3 examination.  See, supra, at 5.  Thus, because

Monger has not come forward with evidence suggesting that he was qualified for the three reclassified TE3 positions, no reasonable jury could conclude that the DOT unlawfully discriminated against Monger by reclassifying Melo, Patel, and Lloyd.

For similar reasons, Monger has not carried his initial burden of showing that he was qualified for the TE3 job opening in the Division of Hydraulics and Drainage. Monger does not dispute that the position "required, among other things, 'considerable knowledge' of hydrologic and hydraulic engineering related to storm drainage systems, culverts, highway or railroad bridges over waterways, dams and related facilities." Defs.' L.R. 56(a)1 at ¶ 68; Pl.'s L.R. 56(a)2 at 5, ¶ 68. Nor does Monger come forward with evidence suggesting that he possessed the requisite expertise, or that the DOT selectively applied these hiring criteria to exclude him. Thus, as the undisputed record reveals that Monger was not qualified for the TE3 vacancy in the Division of Hydraulics and Drainage, this vacancy does not provide a basis for concluding that the DOT unlawfully discriminated against Monger in violation of Title VII.

In contrast, there are genuine issues of fact as to whether Monger was qualified for the TE3 job openings in the Office of Rails. The defendants argue that Monger was not qualified for these positions because he did not have a degree in Civil Engineering or Structural Engineering. Defs.' Mem. at 15–16. However, at least one of the job postings for these positions stated that a degree in Civil Engineering or Structural Engineering was "preferred," not required. Defs.' L.R. 56(a)1 at ¶ 80; Pl.'s L.R. 56(a)2 at 5, ¶ 80. Furthermore, Monger comes forward with evidence suggesting that Monger's degree in Civil Engineering Technology was comparable to a degree in Civil Engineering or Structural Engineering. Pl.'s L.R. 56(a)2 at 13, ¶ 27. Based on this

evidence, a reasonable jury could conclude that Monger was qualified for the TE3 job openings in the Office of Rails.

b.    Inference of Discrimination

The defendants argue that Monger has not established the fourth element of the prima facie case of discrimination because there is no evidence in the record suggesting that Monger was denied promotions under circumstances giving rise to an inference of race discrimination.  Def.'s Mem. at 14–15.  However, "[t]he fourth prong can be established by showing that the position was filled by someone outside the protected class[.]"  Diaz v. New York City Transit Auth., 98 F. App'x 58, 59 (2d Cir. 2004); see also Littlejohn v. City of New York, 795 F.3d 297, 313 (2d Cir. 2015) ("The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis[.]").  Here, it is undisputed that all of the promotional opportunities at issue in this case were given to non-African Americans and, thus, to people outside of Monger's protected class.  See Pl.'s Opp'n at 6 (listing the race of each applicant selected to fill the TE3 positions at issue in this case).  Monger has therefore carried his "minimal" burden of adducing evidence that the alleged discriminatory denials of promotion occurred under circumstances giving rise to an inference of discrimination. Littlejohn, 795 F.3d at 313 (internal quotation marks omitted).

In summation, the undisputed record reveals that Monger has not come forward with evidence establishing a prima facie case of discrimination with respect to (1) the TE3 positions that Lloyd, Melo, and Patel secured through the reclassification process, and (2) the TE3 job openings that were posted by the Division of Hydraulics and

Drainage.[2]  For the remaining positions, the defendants have not shown that there is no

issue of material fact as to whether there is a prima facie case of discrimination.

### 2.    Legitimate Non-Discriminatory Purpose

Once the plaintiff has come forward with sufficient evidence to show a prima

facie case, "such a showing will raise a temporary 'presumption' of discriminatory

motivation[.]"  Id. at 307.  To rebut this presumption, the employer must "come[ ] forward

with admissible evidence of a legitimate nondiscriminatory reason for its adverse

employment decision."  Howley, 217 F.3d at 150.  The Second Circuit has noted that

the defendant's burden is "not a demanding one[.]"  Bickerstaff v. Vassar Coll., 196 F.3d

435, 446 (2d Cir. 1999).  The employer "need not prove the absence of discriminatory

motive or that the [adverse employment decision] was motivated by a legitimate

reason."  Meiri v. Dacon, 759 F.2d 989, 996 n.11 (2d Cir. 1985) (emphasis in the

original).  Instead, the employer need only articulate "legitimate nondiscriminatory

reasons [that are] clear and specific."  Bucalo v. Shelter Island Union Free Sch. Dist.,

691 F.3d 119, 132 (2d Cir. 2012) (internal quotation marks omitted).

Here, the defendants have offered evidence of a legitimate nondiscriminatory

reason for not promoting Monger, namely: that there were applicants who were more

qualified than Monger for each TE3 position at issue in this case.  As summarized

above, see, supra, at 4–15, the Interview Selection Reports documented clear and

specific reasons for why Monger's applications were rejected.  For example, in the case

---

[2] Even if the court were to conclude that Monger had carried his initial burden with respect to
these positions, summary judgment would be warranted because, as discussed below, Monger has not
come forward with evidence suggesting that the DOT's decisions to not promote him were motivated by
discriminatory animus.  See, infra, at 23–35.

of the TE3 vacancies in the Office of Rails, the interview selection panel noted that

Monger did not possess the preferred educational degree.  See, supra, at 6–7.  For the

other job openings, the reasons for not selecting Monger included, inter alia, that (1)

Monger possessed less knowledge or expertise about the position's subject matter than

the selected applicants; (2) Monger provided less detailed and less complete answers

during his interview than the selected applicants did; and (3) Monger's job performance

reviews were worse than those of the selected applicants.  See, supra, 7–15.  These

reasons are supported by evidence in the record, including, inter alia, the Interview

Selection Reports, Monger's job performance reviews, and sworn affidavits from

members of the job selection panels.  As such, the defendants have carried "[their]

burden of producing reasons for [their] actions which, if believed by the trier of fact,

would support a finding that unlawful discrimination was not the cause of the

employment action."  Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (internal

quotation marks omitted).

        3.     Pretext

Where, as here, "the employer produces evidence of legitimate reasons for its

actions, the burden shifts back to the plaintiff to prove, by a preponderance of the

evidence, that the real reason for the adverse employment decision was discrimination."

Mandell v. Cty. of Suffolk, 316 F.3d 368, 380–81 (2d Cir. 2003).  To survive summary

judgment, the plaintiff must adduce admissible evidence showing "circumstances that

would be sufficient to permit a rational finder of fact to infer that the employer's

employment decision was more likely than not based in whole or in part on

discrimination."  Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (internal

quotation marks and alterations omitted).  In doing so, "the plaintiff is entitled to rely on

the evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action." Norton, 145 F.3d at 118 (internal quotation marks omitted). "Although plaintiff is not required to show that the employer's proffered explanation is unworthy of credence, evidence of pretext may help plaintiff carry his ultimate burden on this final stage of the McDonnell Douglas analysis." Mandell, 316 F.3d at 381 (internal quotation marks omitted). That said, "merely showing that the employer's proffered explanation is not a genuine explanation does not in itself entitle the plaintiff to prevail; the plaintiff is not entitled to judgment unless she shows that the challenged employment decision was more likely than not motivated, in whole or in part, by unlawful discrimination." Howley, 217 F.3d at 150; see also Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 156 (2d Cir. 2010) ("The crucial element of a claim under Title VII is discrimination, not dishonesty.").

Monger argues that a reasonable juror could conclude from the record that the DOT's reasons for denying him a promotion were pretext for unlawful discrimination. Pl.'s Opp'n at 11–17. As evidence of discriminatory animus, Monger points to (1) an isolated remark that Mather made in November 2013, id. at 15–16; (2) instances where Monger claims his supervisors treated him unfairly, see, e.g., id. at 8; and (3) the fact that Monger was not invited to certain DOT training sessions that his white co-workers attended, see, e.g., at 7. In addition, Monger argues that discriminatory animus can be inferred from the development and application of DOT's TE3 promotion criteria, see, e.g., at 14. As discussed below, however, this evidence, when viewed as a whole, see Howley, 217 F.3d at 151, does not provide a basis from which a reasonable juror could

conclude that the DOT's decisions to not promote Monger were motivated in whole or in part by unlawful discrimination.

a.   Remark

To begin, Monger points to a single, isolated remark that Mather made in November 2013, as evidence of racial animus. Id. at 15–16. More specifically, Monger testified at his deposition that Mather uttered the words "one down" in connection with the firing of a female African American co-worker in November 2013. Id. Monger argues that this remark "epitomiz[es] Mather's and the DOT's animus regarding its African American employees." Id.

It is true that a single remark may be probative of discriminatory animus. Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir.2007). However, "all comments pertaining to a protected class are not equally probative of discrimination[.]" Id. "In determining whether remarks are probative of discriminatory intent, a court properly considers (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 586 F. App'x 739, 742 (2d Cir. 2014) (quoting Henry, 616 F.3d at 149).

Notwithstanding Mather's status as a supervisor and decision-maker, Mather's comment does not raise a triable issue of employment discrimination in light of its content, timing, and context. See Henry, 616 F.3d at 150 (cautioning that "none of these factors should be regarded as dispositive"). To begin, the court notes that Mather's

comment is "devoid of direct or even oblique reference to race or national origin."  <u>Grant v. Cont'l Cas. Co.</u>, No. 13 CIV. 5675 AT, 2015 WL 1499724, at *8 (S.D.N.Y. Mar. 30, 2015).  It would therefore be speculative to conclude that Mather's "one down" remark referred to the terminated employee's race, as opposed to any number of other characteristics.  <u>See</u> <u>id.</u>

Moreover, even assuming a reasonable juror would view Mather's remark as discriminatory, "both the context of [this] comment . . . and its timing . . . are too remote and oblique to raise a triable issue of pretext."  <u>Wesley-Dickson</u>, 586 F. App'x at 743. Mather's remark was not made in connection with any of the TE3 job openings at issue in this case.  Instead, it related to the employment termination of one of Monger's co-workers.  <u>See</u> Pl.'s Opp'n at 15; <u>see</u> <u>also</u> <u>Henry</u>, 616 F.3d at 149 (2d Cir.2010) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.") (internal quotation marks and alterations omitted).  Furthermore, Mather made this remark at least two years before Monger applied for a TE3 position and was rejected.[3]  <u>See</u> <u>Wesley-Dickson</u>, 586 F. App'x at 742 (noting that a stray remark made 6 months before the adverse employment action was too remote and oblique to raise a triable issue of pretext).  Notably, courts in this Circuit have routinely disregarded remarks by decision-makers that were more racially charged and more temporally associated with an adverse employment action than Mather's remark.  <u>See</u>, <u>e.g.</u>, <u>White v. Andy Frain</u>

---

[3] While the TE3 job openings at issue in this case were all posted two years after Mather's stray comment in November 2013, the reclassifications of Melo and Patel occurred earlier, <u>i.e.</u>, in January and February of 2014.  However, as noted above, Monger was not qualified for the TE3 positions given to Melo and Patel because he had not passed the TE3 examination at the time that these reclassifications occurred.  <u>See</u>, <u>supra</u>, at 18.

Servs., Inc., 629 F. App'x 131, 134 (2d Cir. 2015) ("[S]everal off-color comments over the course of a year and a half about [the plaintiff] being black and Jewish . . . were no more than stray remarks."); Norris v. New York City Hous. Auth., No. 02 CIV. 6933 (RJH), 2004 WL 1087600, at *10 (S.D.N.Y. May 14, 2004) (concluding that comments disparaging "[plaintiff's] Afrocentricity, manner of dress, hairstyles, and reading materials [were] not probative of racial or sex-based animus"); Gorley v. Metro-N. Commuter R.R., No. 99 CIV. 3240 NRB, 2000 WL 1876909, at *6 (S.D.N.Y. Dec. 22, 2000) (collecting cases), aff'd sub nom. Gorley v. Metro N. Commuter R.R., 29 F. App'x 764 (2d Cir. 2002).

Thus, given that Mather's remark was facially race neutral, temporally remote from any adverse employment action in which Mather was a decision-maker, and not related to any of the TE3 vacancies at issue in this case, no reasonable jury could infer from this remark alone that the DOT's decisions to not promote Monger were motivated in whole or in part by discriminatory animus. Of course, the Second Circuit has cautioned in discrimination cases against "consider[ing] the record solely in piecemeal fashion[.]" Howley, 217 F.3d at 151. Isolated comments that, by themselves, are not probative of discriminatory intent may nevertheless take on "a more ominous significance" when combined with "other indicia of discrimination[.]" Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir.1998) (cautioning that isolated remarks should be viewed in the context of the evidence as a whole). However, as discussed below, no such indicia of discrimination exist in the record before the court. Mather's isolated comment is therefore simply a non-probative stray remark.

b.    <u>Supervision</u>

Monger argues that his supervisors unfairly treated him in ways that damaged his chances of securing a TE3 promotion.  <u>See</u>, <u>e.g.</u>, Pl.'s Opp'n at 16–17.  In particular, Monger asserts that Mather brought a "frivolous" disciplinary action against him in 2015 for rearranging the furniture in his cubicle.  <u>Id.</u> at 8–9.  He also suggests that the satisfactory ratings that he received on his performance reviews were unwarranted.  <u>See</u> <u>id.</u> at 3–4.  Finally, Monger argues that his supervisors have underutilized his talents and stunted his professional development by assigning him non-managerial tasks, "such as drafting memos, reviewing construction and design plans, preparing consultant costs, and reviewing estimates."  <u>Id.</u> at 16–17.

However, Monger has not come forward with evidence suggesting that racial animus was a factor in any of the aforementioned actions.  Monger does not, for example, point to comments or statements made by his supervisors that had racial content or overtones.  Nor does he provide circumstantial evidence suggesting that non-African American co-workers who were in similar situations received more favorable treatment.  <u>See</u> <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 43 (2d Cir. 2000) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination.").

Instead, Monger's "reasoning is on the order of: (1) something bad happened to him; (2) he is a member of a protected class; and (3) therefore the bad thing has happened because he is a member of a protected class."  <u>Martin v. Nat'l R.R. Passenger Corp.</u>, No. 10 CIV. 4199 CM, 2012 WL 1129360, at *7 (S.D.N.Y. Mar. 30,

2012) (internal quotation marks and alterations omitted) (quoting <u>Magadia v. Napolitano</u>, No. 06 CIV. 14386(CM), 2009 WL 510739, at *13 (S.D.N.Y. Feb. 26, 2009)).  This reasoning, however, is not sufficient.  <u>See id.</u>  As the Second Circuit has explained, to survive summary judgment, a plaintiff must do more than "cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race." <u>Grillo v. New York City Transit Auth.</u>, 291 F.3d 231, 235 (2d Cir. 2002) (internal alterations and quotation marks omitted).  Put simply, "a jury cannot infer discrimination from thin air."  <u>Norton</u>, 145 F.3d at 119.  Thus, as there is no other evidence in the record suggesting that Monger's treatment by his supervisors was motivated by discriminatory animus, such treatment does not create an inference of discrimination.

c.     <u>Training Opportunities</u>

Monger argues that racial animus can be inferred from the fact that Monger was not invited to attend certain DOT training courses that some of his non-African American colleagues attended.  Pl.'s Opp'n at 7, 24.  In particular, Monger notes that Booth, a White co-worker, participated in two training sessions that Monger did not attend: (1) the Bridge Summit Training, and (2) the Scour Critical Evaluation Training.  Defs.' L.R. 56(a)1 at ¶ 47; Pl.'s L.R. 56(a)2 at 4, ¶ 47, 21, ¶ 77.  However, Monger does not offer any evidence suggesting that he was denied permission to attend these sessions. <u>Shao v. City Univ. of New York</u>, No. 12-CV-1566 RJS, 2014 WL 5038389, at *6 (S.D.N.Y. Sept. 30, 2014) (rejecting denial of training opportunities claim where the plaintiff did not point to specific instances of her supervisor refusing to permit plaintiff to attend the events).  Instead, Monger merely claims that he was not aware that the training sessions were taking place.  <u>See</u> Monger Deposition (Doc. No. 88-3) at 116:18–25.  Although Monger asserts that "Mather control[ed] what training employees

receive[d] in Monger's unit," Pl.'s Opp'n at 7, such conclusory testimony does not support a reasonable inference that the DOT prevented Monger from learning about these training opportunities, see McGill v. Univ. of Rochester, 600 F. App'x 789, 791 (2d Cir. 2015) (requiring that "a plaintiff produce something more than conclusory allegations") (internal quotation marks omitted).

Other considerations further undercut Monger's claim of inequitable training opportunities. First, it is undisputed that Booth acted on his own initiative to learn about and attend the Scour Critical Evaluation Training. Defs.' L.R. 56(a)1 at ¶ 50; Pl.'s L.R. 56(a)2 at 4, ¶ 50. Monger does not offer any evidence or explanation for why he could not have taken similar initiative in seeking out training opportunities. Furthermore, the undisputed record reveals that Monger attended 32 formal training courses between 2008 and March 22, 2017. Defs.' L.R. 56(a)1 at ¶ 46; Pl.'s L.R. 56(a)2 at 3, ¶ 46. Although the record does not indicate whether Monger has attended more or less training courses than his peers, Monger noted in his Deposition that he had "[completed] so many courses over the years" that he couldn't name all the courses that he had attended. Defs.' L.R. 56(a)1 at ¶ 46; Pl.'s L.R. 56(a)2 at 3, ¶ 46. Thus, the undisputed record as a whole suggests that Monger had ample opportunities to participate in DOT training courses, and Monger himself does not argue otherwise. Accordingly, Monger's failure to attend certain training sessions does not create an inference of discriminatory animus.

### d.    Promotion Practices

Finally, Monger argues that discriminatory intent can be inferred from the DOT's promotion practices. See, e.g., Pl.'s Opp'n at 14–15. In support of this claim, Monger offers four pieces of evidence.

First, Monger points to the fact that he was denied an interview for the TE3 vacancies in the Office of Rails because he had a Civil Engineering Technology degree. See id. Notwithstanding the fact that the job postings for these positions stated a preference for applicants with Civil Engineering or Structural Engineering degrees, see, supra, at 6–7, Monger suggests that the DOT's reason for denying him an interview is pretextual because a degree in Civil Engineering is functionally equivalent to the two preferred degrees, see Pl.'s Opp'n at 14–15. In addition, Monger questions the reasonableness of giving preference to employees with Civil Engineering or Structural Engineering degrees, essentially arguing that the DOT's proffered rationale for preferring these degrees makes no sense in light of the tasks that employees in these positions must actually perform. See id.

As the Second Circuit has explained, however, "Title VII is not an invitation for courts to sit as a super-personnel department that reexamines employers' judgments." Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 73 (2d Cir. 2015) (internal quotation marks and citations omitted). Accordingly, "[a] plaintiff is not entitled to get his or her case before a jury by contending that the demands of the employer were not reasonably related to the performance of the job." Thornley v. Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997). "Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 118 (2d Cir. 2010). Given that the two TE3 job openings in the Office of Rails called for specialized engineering knowledge, see, supra, at 6–7, the DOT's

preference for certain degrees over others is not "so implausible as to call into question its genuineness." Id.

Moreover, even if Monger had shown that the DOT's reasons for denying him an interview for the TE3 positions in the Office of Rails were pretextual, he has not carried his burden of showing that the DOT's reasons were pretext for prohibited discriminatory animus. A plaintiff cannot survive summary judgment merely by offering evidence that would allow a reasonable factfinder to "disbelieve the employer[.]" Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000) (emphasis in the original). Instead, there must be a factual basis in the record for "believ[ing] the plaintiff's explanation of intentional discrimination." Id. (emphasis in original). Monger, however, has not come forward with evidence suggesting that the DOT's real reason for denying him an interview was discriminatory animus. Indeed, such an inference is belied by the DOT's uniform application of its educational criteria. Specifically, every applicant who possessed one of the preferred degrees was given an interview, while every applicant who did not possess one of the preferred degrees was denied an interview, including three applicants who, like Monger, possessed a degree in Civil Engineering Technology. Defs.' L.R. 56(a)1 at ¶¶ 88, 90; Pl.'s L.R. 56(a)2 at 6, ¶¶ 88, 90.

Monger's second piece of evidence is the fact that Mather was employed as the Office of Rails' Principal Engineer, even though he did not have the Professional Engineer License that is required for that position. See Pl.'s Opp'n at 15. Monger reasons that, because the DOT "grandfathered" Mather into his position by relaxing the hiring criteria for Principal Engineers, it was discriminatory for the DOT to not give Monger "a similar benefit of being grandfathered into a TE3 position[.]" Id.

It is true that "[a] showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." Graham v. Long Island Rail Road, 230 F.3d 34, 43 (2d Cir.2000). However, Monger and Mather are not similarly situated employees, most notably because the TE3 positions at issue in this case are materially different from Mather's Principal Engineer position in terms of responsibilities and requirements. See, supra, at 2 (noting that a Principal Engineer supervises TE3s); Pl.'s Opp'n at 2 (acknowledging that, "[a]s Principal Engineer, Mather led the entire Office of Rail operation"); see also Cooper v. Morgenthau, No. 99 CIV. 11946 (WHP), 2001 WL 868003, at *7 (S.D.N.Y. July 31, 2001) (concluding that plaintiff and co-worker were not similarly situated because they held different positions and did not share common job descriptions). As a result, evidence of Mather's grandfathering into the Professional Engineer position "is insufficient to permit a jury to find pretext, much less discrimination[.]". Thompson, 379 F. App'x at 73.

Third, Monger argues that discriminatory animus can be inferred from the fact that he was objectively more qualified than many of the applicants who were selected to fill the TE3 job openings. See Pl.'s Opp'n at 7, 20, 22. In particular, he points out that he had more education (a Master's Degree instead of a Bachelor's Degree) and more years of experience working at the DOT (8 years instead of four years) than Portal and Booth, two applicants who were selected for TE3 positions in the Bureau of Engineering and Construction. See Pl.'s Opp'n at 20, 22; Pl.'s L.R. 56(a)2 at 11, ¶¶ 15, 16.

As the Second Circuit has explained, however, "federal antidiscrimination law does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory." Village of Freeport v. Barrella, 814 F.3d 594, 614 (2d Cir. 2016) (internal quotation marks omitted). In order for a plaintiff "to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, . . . the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (internal quotation marks omitted). Thus, "[w]hen a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn." Lieberman v. Grant, 630 F.2d 60, 67 (2d Cir. 1980).

In this case, Monger's credentials are not "so superior to the credentials of the person selected for the job" as to raise an inference of discriminatory animus. Byrnie, 243 F.3d at 103. Although Monger had more education and more years of work experience than both Booth and Portal, the interview selection panel noted that Booth received better job performance reviews than Monger and that he also correctly answered more interview questions. See, supra, at 14–15. Similarly, the panel noted that (1) Portal performed better than Monger in his interview by providing more thorough answers to questions about project design and administration, and that (2) Portal had more experience than Monger at handling complex projects. See, supra, at 13–14.

Monger does not come forward with evidence to dispute these findings made by the interview selection panel. Thus, because Monger, Booth, and Portal "each offered distinct advantages," and because the DOT "was entitled to weigh which [advantages it] most valued," Monger's credentials do not create an inference of discriminatory animus. Village of Freeport, 814 F.3d at 614.

Finally, Monger offers as circumstantial evidence of discrimination his observations that (1) he is the only African American engineer in the Office of Rails, and (2) that an unspecified number of "other minority individuals at the DOT . . . have been passed over for promotions in favor of their white coworkers." Pl.'s Opp'n at 15–16. This evidence, however, "amounts to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination." Lomotey v. Connecticut-Dep't of Transp., 355 F. App'x 478, 481 (2d Cir. 2009). A variety of non-discriminatory factors, such as differences in qualifications or work experiences, could explain the absence of African American engineers in the Office of Rails and the DOT's failure to promote an unspecified number of non-White employees. As Monger does not make "any attempt to account for [these] other causes," no reasonable jury could infer discrimination on the basis of this vague circumstantial evidence. Hollander v. Am. Cyanamid Co., 172 F.3d 192, 203 (2d Cir. 1999), abrogated on other grounds by Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000).

In summation, viewing the record as a whole and in the light most favorable to Monger, the court concludes that no reasonable jury could find that the DOT's failure to promote Monger was motivated in whole or in part by prohibited discriminatory animus.

Accordingly, summary judgment is warranted as to Monger's Title VII failure to promote claim.

　　　B.　　Title VII Retaliation

　　　The defendants argue that summary judgment is also warranted as to Monger's Title VII retaliation claim, which claim asserts that, in response to Monger filing complaints of race discrimination with DOT's Affirmative Action Office and the CHRO, DOT unlawfully retaliated against him by rejecting his subsequent applications for a TE3 promotion. See Def.'s Mem. at 33.

　　　As with Title VII claims of race discrimination, Title VII claims of retaliation are subject to the McDonnell Douglas burden-shifting standard. Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014). Thus, "[u]nder the first step of the McDonnell Douglas framework, the plaintiff must establish a prima facie case of retaliation by showing (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013) (internal quotation marks omitted). Once the employer makes a prima facie case of retaliation, "the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." Kirkland, 760 F.3d at 225. "If the defendant provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015) (internal quotation marks and citations omitted).

　　　As the Second Circuit has explained, "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse

action would not have occurred in the absence of the retaliatory motive." Zann Kwan, 737 F.3d at 846. A plaintiff cannot defeat summary judgment at the pretext stage by relying solely on the "temporal proximity between a protected complaint and an adverse employment action." Ya-Chen Chen, 805 F.3d at 72 (internal quotation marks omitted). However, "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at [the pretext] stage." Zann Kwan, 737 F.3d at 847.

In this case, even if the court assumes that Monger has carried his initial burden of establishing the prima facie case of retaliation, his Title VII claim fails as a matter of law. As discussed above, see, supra, at 22–23, the DOT has come forward with admissible evidence of a legitimate nondiscriminatory reason for each of its decisions to not promote Monger to the TE3 position. Monger, however, has not come forward with sufficient evidence that the DOT's desire to retaliate was the but-for cause of his promotion denials.

In particular, the court has already reviewed all of Monger's evidence of discriminatory animus when determining whether summary judgment was warranted as to Monger's Title VII claim of race discrimination. See, supra, at 17–36. As discussed above, see id., no reasonable jury could conclude from this evidence that racial animus, retaliatory animus, or any other prohibited discriminatory animus was a motivating factor in the DOT's decisions to deny Monger a TE3 promotion, much less the but-for cause of those decisions. See Zann Kwan, 737 F.3d at 845 ("[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse

action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."). As a result, Monger's retaliation claim rests solely on the fact that he was denied certain TE3 promotions within five months of filing his complaint of race discrimination with the CHRO. See Pl.'s Opp'n. at 20. Thus, because "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage[,]" summary judgment is warranted as to Monger's Title VII retaliation claim. Zann Kwan, 737 F.3d at 847.

C.    Equal Protection

Finally, the defendants argue that summary judgment is warranted as to Monger's Equal Protection claim because, inter alia, there is no evidence suggesting that Mather discriminated against Monger on the basis of race. Def.'s Mem. at 26–29.

The Second Circuit has held that, "[o]nce action under color of state law is established, [a plaintiff's] equal protection claim parallels his Title VII claim. The elements of one are generally the same as the elements of the other and the two must stand or fall together." Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). Thus, in order to survive a motion for summary judgment on his equal protection claim, Monger "must come forward with at least some credible evidence that the actions of the individual [defendants] were motivated by racial animus or ill-will." Grillo, 291 F.3d at 234; see also Burgis v. New York City Dep't of Sanitation, 798 F.3d 63, 68 (2d Cir. 2015) ("To state a discrimination claim under the Fourteenth Amendment Equal Protection Clause and/or § 1981, plaintiffs must sufficiently allege that defendants acted with discriminatory intent.").

As discussed above, see, supra, at 17–36, Monger has not raised a genuine issue of fact to support his Title VII discrimination claim. In particular, no reasonable jury could conclude from the record that the DOT's or Mather's actions were motivated

by discriminatory animus.  <u>See</u>, <u>supra</u>, at 23–38.  Accordingly, summary judgment is warranted as to Monger's Equal Protection claim under the Fourteenth Amendment.

## VI.     CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 75) is **GRANTED**.  The Clerk is directed to close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 31st day of January, 2019.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge